In re BAYSIDE MARINA,
INC., Debtor.

Bayside Marina, Inc., and Lawrence
Digiacomo, Plaintiff,

v.

LDI Holding Corp., Jesse Cromer, and
Ivor Jacobson, Defendants.

Bankruptcy No. 899–81123–478.
Adversary No. 800–8013–478.

United States Bankruptcy Court,
E.D. New York.

Aug. 13, 2002.

Zinker Gelfand & Hertzberg, by Jeffrey Herzberg, Smithtown, NY, for plaintiff.

Steven M. Nachman, New York City, for defendants, LDI Holding Corp. and Ivor Jacobson.

Neil H. Ackerman, Warshaw, Burstein, Cohen, Schlesinger & Kuh, LLP, New York City, Chapter 7 Trustee.

## MEMORANDUM DECISION AWARDING LDI HOLDING CORP. USE AND OCCUPATION PAYMENTS AND FIXING THE PROOF OF CLAIM OF LDI HOLDING CORP.

DOROTHY EISENBERG, Bankruptcy Judge.

This Court has been called on to resolve ongoing disputes over the rights of various parties in and to certain real property located at 151–19 Powells Cove Boulevard, Whitestone, New York (the "Property"). Pursuant to a written decision dated June 5, 2002, the Court made certain findings and directed that pursuant to an award of specific performance, LDI Holding Corp. ("LDI") sell the Property to Bayside Marina, Inc. (the "Debtor") for the original contract price of $350,000. This Court left

open certain issues to be resolved: chiefly, whether the Debtor is entitled to offset the use and occupation payments made by the Debtor during the pendency of this matter against the remaining purchase price, whether any of the parties are entitled to damages because of this adversary proceeding, and the fixing of LDI's prepetition claim. The following constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

FACTS

For a complete recitation of the facts pertinent to this adversary proceeding, refer to this Court's memorandum decision dated June 5, 2002 (the "June Decision"). In the June Decision, the Court found that the Debtor and LDI entered into a contract dated April 2, 1998 to sell the Property to the Debtor for $350,000 (the "Stipulation"). The parties entered into the Stipulation to resolve several disputes which had arisen between LDI as landlord and the Debtor as tenant. Prior to entry of the Stipulation, the parties had entered into a Lease dated as of March 15, 1995 (the "Lease"), which granted to the Debtor an option to purchase the Property from LDI only if "at the Closing (as defined in the Purchase Agreement), Tenant shall pay in full all outstanding Fixed Rent and Additional Rent." (Section 35.01(i) of Lease). This section further provides that "all provisions of this Lease pursuant to which Tenant is obligated to pay any sum of money to Landlord, or to indemnify, defend and/or hold Landlord harmless from any cost, claim, expense, action, damage or liability shall survive the Closing and the termination of this Lease."

The Stipulation, which created a new contract between the Debtor and LDI, does not specifically state that all of the Lease terms are cancelled and deemed a nullity. The Stipulation further identifies the Debtor as "Tenant" and LDI as "Landlord," and provides that in the event of a default by the Debtor, execution on a warrant of eviction is to be had and LDI is to be granted a judgment in the amount of $115,000. On execution of the warrant of eviction, credit is to be given for all nonrefundable deposits paid by the Debtor towards the $115,000 judgment. The Stipulation further provides that a portion of the purchase price of the Property may be allocated to back rent owed by the Debtor. This indicates that the Lease terms and sale pursuant to the Stipulation were not to merge.

According to LDI's principal, Mr. Ivor Jacobson, the figure of $115,000 was arrived at based on a rough estimate of rent due and owing by the Debtor to LDI through the proposed closing date plus accrued interest, legal fees and taxes. (12/27/01 Tr. at 151–52). Mr. DiGiacomo, the Debtor's principal, did not contradict this testimony, but he did not recall what this amount was based on. (12/04/01 Tr. at 109).

As of June 29, 1998, the Debtor had, *inter alia*, made payments totaling $100,000 towards the purchase price. One day prior to the date of sale, Jesse Cromer commenced litigation and filed a *lis pendens* against the Property, claiming that he had ownership of a portion of the Property and an easement running over the remainder of the Property to enable him to reach that portion. As a result of Cromer's actions, LDI breached the Stipulation because it could not provide marketable, clear title to the Property to the Debtor, and the nature of this breach excused the Debtor from tendering the $250,000 owed under the Stipulation on the closing date.

LDI participated in the state court litigation commenced by Cromer by filing an answer and counterclaim. In other papers filed by LDI in connection with the Crom-

er litigation, LDI referred to Cromer's claims as "baseless" and challenged Cromer's easement and ownership claims. Nonetheless, Judge Lisa signed an Order dated December 8, 1998 granting a preliminary injunction enjoining LDI, the Debtor and Lawrence DiGiacomo, the Debtor's principal, from interfering with Cromer's use of the Property pending resolution of Cromer's claims, provided that Cromer post a bond in the amount of $250,000 by January 8, 1999.

Prior to expiration of the preliminary injunction issued by Judge Lisa, LDI did request relief against the Debtor in Landlord/Tenant court, seeking entry of a judgment of possession of the Property. By written decision dated December 18, 1999, Judge Gottlieb determined that the Cromer Litigation affected the ability of the parties to close on the sale of the Property. (Deft's Exh. QQ). Notwithstanding this finding, Judge Gottlieb "revisited" the nonpayment proceeding giving rise to the parties' entry into the Stipulation, and held that while the Cromer litigation was underway, the Debtor was obligated to pay to LDI monthly use and occupancy of $4,166.67 beginning from July 1998 and a judgment was to be entered against the Debtor and in favor of LDI in the amount of $115,000. This $115,000 figure appears to be based on the unpaid rent, taxes and costs owed by the Debtor which had accrued to the date of the scheduled closing on June 30, 1998. Upon determination of the issues arising from the Cromer Litigation, Judge Gottlieb directed that the parties are permitted to "resume their contractual positions." (Deft's Exh. QQ).

LDI's breach of the Stipulation continued until this Court resolved Cromer's claims and found that a) Cromer did not own any portion of the Property, and b) Cromer did not have an easement over any portion of the Property, by deed or by prescriptive easement. This Court directed that the *lis pendens* filed by Cromer against the Property be removed, thereby removing the cloud from title to the Property. Cromer did not participate in this adversary proceeding after the summary judgment stage, and an order was entered on June 28, 2001 which precluded him from introducing any discovery-related evidence in support of his claims since he defaulted on his obligation to respond to discovery requests served by LDI.

In its written decision, this Court requested additional briefs on the issue of whether LDI is entitled to retain the monthly payments the Debtor has made as use and occupancy of the Property since June 30, 1998 or whether the payments are to be applied towards the purchase price of the Property. The total amount of monthly payments made to LDI for post petition use and occupancy of the Property equals in excess of $100,000. The Court also sought additional papers on whether the Debtor is entitled to indemnification from LDI for the costs and expenses incurred in connection with resolving the cloud on title to the Property created by the commencement of litigation by Cromer. Pursuant to a motion filed by LDI, the Court is also called on to fix LDI's prepetition claim which LDI filed in this case in the amended amount of $55,073.09. LDI's total prepetition claim is comprised of the $115,000 judgment awarded by Judge Gottlieb, use and occupancy from July 1998 through February 1999, plus taxes in the amount of $6,739.83, less $100,000 credit for the down payment made by the Debtor. LDI also seeks an administration claim in the amount of $78,640.64 for rent due from March 1999 through August 1999 and November 2001 through July 2002, and interest on the prepetition claim to date and on the administration claim for the period March 1999 through August 1999 totaling $23,497.47.

## DISCUSSION

### Treatment of monthly payments made by the Debtor to LDI

 In order to fix the amount that the Debtor still owes to purchase the Property, the Court must determine whether the monthly use and occupation payments made by the Debtor are to be credited to the sale price or whether these payments are meant to cover the Debtor's use and occupation from June 30, 1998 to the present. In general, when a landlord and tenant enter into contract for the sale of real property, or the tenant exercises an option to purchase real property pursuant to a lease, the relationship between the parties is converted to that of vendor and vendee and the landlord-tenant relationship "merges" with the vendor-vendee relationship. *Barbarita v. Shilling*, 111 A.D.2d 200, 201, 489 N.Y.S.2d 86 (2d Dep't 1985). Consequently, where merger has occurred and the lessor/lessee relationship is extinguished, the former landlord may not bring summary proceedings against the lessee for failure to pay rent during the time period between entry of the contract of sale and actual closing. *N.Y.Jur.2d.* Landlord and Tenant § 696 (1999). Generally, this practice is appropriate because the parties have created a new relationship which precludes either party from enforcing rights based on the prior relationship of landlord and tenant.

 However, if the contract of sale reflects a clear manifestation by the parties to the contrary, or if the contract is unclear but the conduct of the parties reflects no merger, then the two contracts will coexist. *Id.; Sid Farber Hempstead Corporation v. Buckley*, 65 Misc.2d 237, 239, 317 N.Y.S.2d 30, 32–33 (1970). In addition, the equities of the situation can affect whether merger of the landlord-tenant relationship into the contract vendor-vendee relationship has occurred. As stated in *William P. Rae Co. v. Courtney:*

Whether in equity there is a merger of a lesser estate in a greater, or an equitable in a legal estate, is largely a question of the intent of the parties, to be gathered to a great extent from the situation of the parties and the surrounding circumstances. Equity looks at the real intent of the parties and not at the mere external form . . . .

In the absence of an expressed intent, equity will look for and ascertain it from all the circumstances surrounding the parties and the transaction.

250 N.Y. 271, 274, 165 N.E. 289, 291 (1929).

Both the law, the equities and prior court rulings favor a finding that the landlord-tenant relationship was not merged into the contract-vendor-vendee relationship created by the Stipulation. Clearly, the Lease itself contemplated that the Debtor would remain liable for rent pending consummation of any sale of the Property. The Lease contains specific language that obligates the Debtor to be current with rent up to the date of any closing and provides that any monetary obligation of the Debtor pursuant to the Lease shall survive the closing and the termination of the Lease.

The terms of the Stipulation and Order do not specifically terminate the obligations of the parties under the Lease. The Stipulation refers to the Debtor as "Tenant" and to LDI as the "Landlord." In addition, paragraph 17 of the Stipulation grants LDI the right to allocate funds paid by debtor to back rent owed as of the closing date. Furthermore, LDI retained the right to execute on a warrant of eviction if the Debtor defaulted. Paragraph 8 of the Stipulation states that if the Debtor defaults at closing, judgment would be granted in favor of LDI in the amount of

$115,000, which amount was based on the rent, interest and counsel fees owed under the Lease through the contemplated closing date. (12/27/01 Tr. at 151–52.) Credit was to be given towards this amount in the amount of any deposits made by the Debtor for the purchase of the Property. Paragraph 11 of the Stipulation provides that in the event a default occurs, all deposits paid by the Debtor shall be forfeited as payment of outstanding rent owed and attorneys fees incurred by the Debtor, which is essentially a re-wording of paragraph 8 of the Stipulation. Therefore, if a default by the Debtor occurred, LDI could keep the deposits made by the Debtor towards the purchase price to offset the judgment to be entered against the Debtor in the amount of $115,000 for back rent, which reflects that the Landlord/tenant relationship did not cease to exist upon entry of the Stipulation.

The fact that the Stipulation preserved LDI's right to collect back rent owed to the date of closing and to proceed to evict the Debtor in landlord tenant court in the event of a default by the Debtor indicates that the landlord/tenant relationship was not extinguished by the terms of the Stipulation. The cases cited in the Debtor's brief support this finding. In *Fulgenzi v. Rink*, 253 A.D.2d 846, 678 N.Y.S.2d 360, 361 (2nd Dep't) the Court held that there is no right to use and occupation from a contract vendee in possession unless the landlord/tenant relationship continues to exist. In this case, the Stipulation gives LDI the right to apportion the purchase price to cover back rent due and owing without limiting the time period the back rent could accrue. If the landlord/tenant relationship had been terminated as of the date of the Stipulation, there would be no reference to rent or pursuit of remedies in landlord/tenant court. The parties would only be left with the rights of a contract vendor and vendee, which would not have

included the right to a money judgment in favor of LDI based on rent and other charges accruing up to the closing date or the right of LDI to obtain a warrant of eviction in landlord/tenant court.

The case of *Bostwick v. Frankfield*, 74 N.Y. 207, 1878 WL 12645 (1878) also supports this Court's finding. In the *Bostwick* case the court affirmed a tenant's eviction after the tenant defaulted on a contract of sale of the property. The Court failed to find that a prior lease merged with a contract of sale of the real property in question where the terms of the contract of sale did not provide that the lease was to be merged into the contract, and a deed was not to be granted to the purchaser/lessee until the purchaser complied with the contract terms. As in *Bostwick*, the Debtor/tenant has no right to the deed until the sale closes pursuant to the Stipulation. The intervening Cromer Litigation served to excuse the Debtor from tendering performance, but the Lease was not extinguished as a result. This is especially true in this case where a final determination on the merits of the Cromer Litigation was not made until very recently and the rights of the parties pursuant to the Stipulation remained in "limbo" for almost four years.

In addition to the case law above, the equities favor a finding that the Lease did not merge with the Stipulation. Since June 1998 to date, the Debtor has continued to remain in sole possession of the Property, and has admitted to deriving a six-figure income from his use of the Property which includes the operation of a marina. (12/27/01 Tr., at 62 – 64). The Debtor continues to rent out parts of the Property for storage and parking for which he collects rent. During this lengthy time period, the Debtor cannot expect to operate its business at the Prop-

erty without paying for such use and occupancy.

While LDI was the breaching party under the law, the breach was caused by Cromer's litigation filed on the day before the closing. LDI did not undertake to prevent the closing and did participate in the Cromer Litigation in order to oppose Cromer's claims in and to the Property. No doubt, LDI was as surprised as the Debtor to discover that Cromer was alleging that he had superior rights in and to the Property, and certainly no party to this proceeding imagined that it would take four years to resolve the Cromer Litigation. To permit the Debtor to remain on the Property for the duration of this time period without making payment for use and occupation would result in a windfall in favor of the Debtor. Based on the equities of this case, the Court cannot in good conscience allow such a result and the Debtor is obligated to pay LDI $250,000 for the purchase of the Property, with no deductions for use and occupation payments made to LDI post petition.

This decision will not result in a windfall in favor of LDI because the purchase price pursuant to the Stipulation is most likely far less than market value. The Property has been valued at $1 million as far back as February 1988 pursuant to an appraisal by Norman F. Hanlon, Inc. which was prepared at the request of the Debtor. In addition, Mr. DiGiacomo testified that 5,000 square foot lots across from the Property were selling for $350,000 in 1998, and the subject Property is more than 32,000 square feet.

This Court also notes that Judge Gottlieb found that use and occupancy payments were appropriate pending the outcome of the Cromer Litigation and served to keep the rights of the parties in status quo. Judge Gottlieb recognized that the Lease had not expired and awarded LDI the judgment in the amount of $115,000 to compensate LDI for the past rent and expenses due to LDI from the Debtor up to the date of the scheduled June 30, 1998 closing. Judge Gottlieb's order was not appealed from by the Debtor and remains binding on the Debtor in its entirety.

Finally, an award of use and occupation to LDI in consistent with a Debtor's obligations under section 503(b), which grants administrative status to charges for a debtor's actual use and occupancy of premises. For at least a portion of the four years in question, the Debtor was occupying the Property under the protection of the Bankruptcy Code and the Bankruptcy Code, in turn, protects parties which confer a benefit upon a debtor's estate. Certainly the Debtor's continued use of the Property during this time conferred a benefit upon the Debtor and LDI is entitled to be compensated for providing such benefit.

*Whether Debtor is entitled to damages against LDI.*

The Debtor claims entitlement to damages against LDI based on LDI's actions in the Cromer Litigation and in connection with this bankruptcy proceeding as follows:

a. $14,000—monthly payments to All Make Leasing, one of the Debtor's prospective lenders, to keep the financing terms available;

b. $830—Chapter 11 filing fee;

c. $750—fees to the Office of the United States Trustee;

d. $55,581.90—$1,684.30 per month for interest incurred on its borrowing of $250,000 in order to purchase the Trustee's rights in and to this adversary proceeding;

e. $2,856.04—origination cost of the borrowing;

f. $750—appraisal fee paid to David Maltz by the Chapter 7 Trustee;

g. $27,933—legal fees incurred by the Chapter 7 Trustee;

h. $5,745.70—legal fees incurred by the Chapter 7 Trustee;

i. $10,195.80—accounting fees incurred by the Chapter 7 Trustee;

j. $530.95—US Trustee fees paid by the Chapter 7 Trustee;

k. $1,250—witness fees for trial before this Court;

l. $4,000—legal fees incurred in opposing eviction proceeding in state court during pendency of Judge Lisa' preliminary injunction;

m. $2,500—legal fees incurred in connection with filing of petition;

n. $20,000—legal fees incurred for representing debtor in bankruptcy case;

o. $45,515.73—legal fees and expenses in incurred in this adversary proceeding;

p. $48,785—additional legal fees and expenses incurred in this adversary proceeding;

■ The total amount of damages the Debtor claims to have suffered equals $241,224.98 plus additional miscellaneous and sundry costs. In this case, the Court has already awarded specific performance in favor of the Debtor. A party awarded specific performance is also entitled to recover as special damages any direct and consequential loss suffered as a result of the seller's refusal to convey the property in accordance with the terms of the contract of sale. *Regan v. Lanze*, 47 A.D.2d 378, 366 N.Y.S.2d 512 (N.Y.A.D.1975), *rev'd on other grounds*, 40 N.Y.2d 475, 354 N.E.2d 818, 387 N.Y.S.2d 79 (1976). The categories under which the Debtor claims entitlement to damages are as follows:

1) legal fees incurred in this adversary proceeding;

2) legal fees incurred in the land-lord/tenant action;

3) fees and costs incurred by the Chapter 7 Trustee in this case;

4) fees and costs incurred in this bankruptcy;

5) payments made to All Make Leasing; and

6) costs incurred to purchase the right to pursue this adversary proceeding.

■ Although courts award damages to successful parties in specific performance actions, specifically excluded from damages are recovery of legal fees incurred by the prevailing party in the litigation because such fees " 'are merely incidents of litigation and are normally not recoverable absent contractual obligation or specific statutory authority.'" *Id.* (citing *Klein v. Sharp*, 41 A.D.2d 926, 343 N.Y.S.2d 1014 (N.Y.A.D.1973)) (other citations omitted.) The exception to this rule is in the event court finds that "the loser has contumaciously deprived a (person) of his clear legal entitlement, forcing the latter into the expense of rescuing himself through legal action." *Park South Associates v. Essebag*, 113 Misc.2d 1026, 1028, 451 N.Y.S.2d 345 (N.Y.1982) (citing *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)).

■ Clearly, an award of legal fees incurred by the Debtor in this adversary proceeding is inappropriate as LDI did not act contumaciously in connection with this litigation, or in connection with the Cromer Litigation. The cloud on title was not caused by LDI's own doing, and LDI will not be held responsible for the legal fees incurred by the Debtor in these actions. The only portion of the legal fees incurred by the Debtor which are directly attributable to LDI's bad faith actions are the fees incurred in the state court action arising from LDI's pursuit of the Debtor in land-

lord/tenant court while an injunction was in place by order of Judge Lisa to preserve the status quo of the parties. Judge Lisa specifically barred any party to the Cromer Litigation from taking any action which would interfere with Cromer's alleged rights in and to the Property. In spite of this, LDI pressed forward with its action seeking to obtain a judgment of possession against the Debtor, which could have affected Cromer's rights inasmuch as Cromer alleged that LDI did not have clear title in and to the Property. The landlord/tenant action did not include Cromer as a party yet rulings could have issued in the landlord/tenant action which could have adversely impacted Cromer's rights. This was precisely why Judge Lisa's preliminary injunction was put into place. Therefore, of all of the legal fees requested by the Debtor, the Debtor is only entitled to reimbursement of $4,000 incurred by the Debtor in the landlord/tenant proceedings, which were not warranted given the fact that Judge Lisa enjoined the parties from taking any action which interfered with Cromer's access to the Property pending Mr. Cromer's payment of the bond.

With regard to the fees and costs incurred by the Debtor in connection with the bankruptcy filing and the Trustee's fees and costs incurred in connection with this case, the Court does not find that an award against LDI for these amounts is appropriate. LDI did not act in such a manner to warrant the granting of fees and costs in favor of the Debtor in this bankruptcy case. The filing of this petition was a tactical decision by the Debtor which does not give rise to consequential damages in its favor. In addition, costs incurred by the Debtor during the pendency of the bankruptcy case are not the type of costs one normally assumes will flow from a vendor's failure to provide good title in connection with the sale of a parcel of real property.

The Debtor also seeks reimbursement for the $14,000 it incurred in order to keep its financing package available from All Make Leasing. In the June Decision, this Court found that the Debtor was ready, willing and able to close on the closing date, and remains so to date. In order to remain ready, willing and able to close, the Debtor had to demonstrate to the Court that he had financing available to close pursuant to the terms of the Stipulation. All Make Leasing was willing to provide the financing as long as the Debtor paid a certain fee to keep the financing terms in place. Debtor did so for a number of months pending a resolution of the Cromer litigation and the removal of the Cromer *lis pendens*. As a result of LDI's inability to provide good and marketable title in and to the Property, the Debtor was required to pay the fee required by All Make Leasing, and the Court finds that this cost in the amount of $14,000 constitutes consequential damages which are compensable by LDI.

The final damage claim flows from the Debtor's costs in borrowing funds to purchase the cause of action from the Trustee. This was the Debtor's choice and LDI is not responsible for such costs. Unfortunately for the Debtor, although LDI did breach the Stipulation, LDI did not cause the breach to occur. The breach was brought on by a third party and the law dictates that LDI be charged only with the consequential losses stemming from its actions. However, the consequential damages suffered by the Debtor resulting from LDI's breach include only the $4,000 in fees incurred in connection with defending itself in the state court landlord tenant action, and the $14,000 paid to All Make Leasing to keep the financing terms available to the Debtor, which was part of the

Debtor's obligations under the Stipulation. Therefore, damages are awarded in the total amount of $18,000 amount in favor of the Debtor.

*LDI's proof of claim.*

Pursuant to the proof of claim filed by LDI (Deft's Exh. UU,) LDI seeks $155,073.09 prepetition. LDI's total claim is as follows:

| | | |
|---|---|---|
| a. | Amount per Judge Gottlieb's order | $115,000 |
| b. | Use and occupancy 7/98 through February 1999 | $ 33,333.36 |
| c. | Taxes | $ 6,739.83 |

This amount is reduced by LDI's own admission by $100,000 pursuant to the down payment already paid by the Debtor, leaving $55,073.09 due in prepetition taxes and use and occupation payments. LDI also seeks interest on the claim pursuant to the Revised Agreement entered into between Lawrence DiGiacomo, the Chapter 7 Trustee, counsel to the Debtor and Jesse Cromer dated October 27, 1999 (the "Revised Agreement"), which was so-ordered by this Court by order dated November 23, 1999. Pursuant to the Revised Agreement, Mr. DiGiacomo agreed to pay interest at an unspecified rate on all administration claims, allowed priority and general unsecured claims in accordance with section 726(a)(5) of the Bankruptcy Code. If the funds held by the Chapter 7 Trustee are insufficient to pay interest on said claims, Mr. DiGiacomo has agreed to remit to the Chapter 7 Trustee all funds necessary to make such payments within ten days following a request by the Chapter 7 Trustee. This agreement is binding upon Mr. DiGiacomo, and Mr. DiGiacomo and no appeal of the order approving the Revised Agreement was ever taken.

LDI asserts that the appropriate interest rate to impose on its prepetition claim and administration claim is 9%, without giving the Court any authority for this rate. However, most courts look to the federal rate of interest in deciding the appropriate interest rate to assess pursuant to § 726(a)(5). *In re Laymon,* 117 B.R. 856, 859–60 (Bankr.W.D.Tex.1990), *rev'd on other grounds, Bradford v. Crozier (In re Laymon),* 958 F.2d 72 (5th Cir. 1992); *In re Goldblatt Bros.,* 61 B.R. 459, 466 (Bankr.N.D.Ill.1986); *In re A & L Properties,* 96 B.R. 287, 290 (C.D.Cal. 1988); and *In re El Paso Refinery, L.P.,* 244 B.R. 613, 621 (Bankr.W.D.Tex.2000). As these courts recognize, an award of postpetition interest on a claim is a matter of federal law, which militates against the use of a state-mandated interest rate. Claims filed in bankruptcy cases can originate in many jurisdictions and to ensure uniformity of treatment of claims, it is appropriate to apply the federal statutory rate of interest on judgments set by section 1961 of title 28 of the United States Code in this instance. Therefore, interest is awarded on LDI's proof of claim at the federal statutory rate calculated from the petition date to the date of payment.

Likewise, pursuant to the Revised Agreement, LDI is entitled to interest at the federal statutory rate on its administration claim for use and occupancy plus real estate taxes owed but not paid from the date these payments were to be made from the petition date to the date of closing. The applicable federal rate of interest will vary with the date each payment was to be made by the Debtor.

*Dismissal of the Action Against Ivor Jacobson*

At the close of the trial, the Court dismissed the claims against Ivor Jacobson brought by the Debtor based on alleged material misrepresentations regarding LDI's ability to convey marketable title. The Court found that there was no evidence of such fraud on the part of Ivor Jacobson, and counsel to Jacobson has requested fees and costs in connection with defending this portion of the adversary proceeding. However, LDI has not shown

any legal authority for the granting of such relief and it is denied.

CONCLUSION

1. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334(b). This is a core matter pursuant to 28 U.S.C. § 157(a)(2)(A), (B) and (O).

2. Based on the terms of the Stipulation, the Lease and the equities of this case, the Court finds that the Lease between LDI and the Debtor did not merge with the option to purchase the Property embodied in the Stipulation and the Debtor remains liable to LDI for use and occupation of the Property from June 1998 to the closing date at a rate of $4,166.67 per month.

3. The Debtor is entitled to consequential damages from LDI in the amount of $18,000, comprised of $4,000 in legal fees incurred in the landlord-tenant action, and $14,000 paid to All Make Leasing in order to keep the terms of the lending proposal open to the Debtor while LDI was in breach of the Stipulation.

4. LDI's prepetition claim is fixed at $55,073.09 plus interest at the federal statutory rate for interest on judgments set by section 1961 of title 28 of the United States Code, as of the petition date, to the date of payment. In addition, LDI is entitled to collect use and occupation payments in the amount of $4,166.67 per month plus additional rent from the petition date to the closing date, with interest fixed at the federal statutory rate applicable at the time that each payment became due and owing, until payment is made.

5. Ivor Jacobson is not entitled to damages from the Debtor.

Settle an Order in accordance with this decision.